UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

     v.                                  CRIMINAL CASE NO. 3:15-cr-47 (VAB)

STEPHEN GOINS,
             Defendant.

## RULING ON DEFENDANT'S MOTION TO SUPPRESS

Defendant, Stephen Goins, has been charged with one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§922(g)(1) and 942(a)(2).  Indictment, ECF No. 1.  The charge arises out of a stop and search that occurred on June 26, 2014 around 7 p.m., while Mr. Goins was driving in his fiancé's car through Bridgeport, Connecticut.  After stopping him, Bridgeport police officers recovered a gun that was in the glove compartment of the car and obtained two confessions from Mr. Goins that the gun belonged to him.

Mr. Goins has filed a Motion to Suppress, ECF No. 21, seeking to exclude both the gun and the two confessions from evidence in his upcoming criminal trial.  He argues that the stop and search violated the Fourth Amendment and that the confessions were involuntary.  On October, 21, 2015, the Court held an evidentiary hearing on Mr. Goins's suppression motion.

The Court finds that the police officers recovered the gun during a lawful traffic stop and protective search consistent with *Michigan v.* Long, 463 U.S. 1032 (1983), and that Mr. Goins's confessions to possessing the gun were not involuntary.  Accordingly, as explained further below, the motion is **DENIED**.

## I.     RELEVANT FACTS

The parties dispute a number of relevant facts surrounding the stop, recovery of the gun, and subsequent confessions.  Mr. Goins argues that there are factual inconsistencies in the Government's version of events that render its story generally unworthy of credence.  Def.'s Suppl. Br. 4, ECF No. 49; Def.'s Br. 10, ECF No. 24.  In addition, Mr. Goins argues that police officers have a duty to file complete and accurate police reports, and that their omission of several facts from their initial reports make any subsequent testimony about the stop and the reports themselves not credible at this time.  Def.'s Suppl. Br. 1, 5, ECF No. 49; Def.'s Br. 4, ECF No. 24.  The Government argues that the reports did not include certain information in order to protect the role and identity of a confidential informant.  Gov't Suppl. Br. 4, 11, ECF No. 50.  All of the officers who testified at the evidentiary hearing confirmed that it was often necessary to leave details about confidential informants out of reports.  Hr'g Tr. 27:24-28:5, 66:22-7, 89:20-90:2, 100:25-3, ECF No. 48.

The Court first will provide an overview of its factual findings and then address and resolve any factual disputes necessary for deciding the suppression motion.

### A.  Findings of Fact

Based on a review of the parties' briefs and exhibits submitted in connection with the Motion to Suppress, ECF No. 21, as well as the evidence presented during the evidentiary hearing held on October 21, 2015 and Mr. Goins's objections and arguments, the Court concludes that the Government has proved the following facts by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 & n. 14 (1974) (noting that the Government must prove facts by a preponderance of the evidence at a suppression motion hearing to carry its burden).

2

In mid-2014, the Bridgeport Police Department employed Officer Paul Scillia as a member of a task force addressing violent crime. Hr'g Tr. 5:2-15, ECF No. 48. On June 26, 2014, just before 7 p.m., Officer Scillia was at the Bridgeport Police Station's front desk booking evidence for one of his cases. *Id.* at 6:20-7:25. While he was there, he learned from the front desk officer[1] that a car containing two individuals and a firearm was driving into Bridgeport to a specific address on Fairfield Avenue. *Id.* at 6:20-22, 7:16-20, 8:1-14. Officer Scillia knew that this information came from a New Britain task force officer, who received the tip from a confidential informant, and that the front desk officer had recently spoken to the task force officer by phone. *Id.* at 8:3-14, 9:8-10, 11:13-17.[2]

The front desk officer was frustrated because he had been unable to reach Sergeant Amato with the information about the car containing the gun. *Id.* at 8:3-19, 12:1-3. Sergeant Amato was a gang task force sergeant at the time and was an appropriate person to act on such information. *Id.* The front desk officer turned to Officer Scillia for guidance on how to handle the situation. *Id.* at 8:7-8. Officer Scillia felt that they shouldn't "just [ ] let this happen" because the front desk officer could not reach Sergeant Amato. *Id.* at 5:2-15, 8:15-22. He obtained the approval of his supervisor, Sergeant Jersey, to pursue the car. *Id.* at 15:2-8.

The front desk officer provided Officer Scillia with a description of the make and model of the car, the full license plate, and an anticipated destination for the car on Fairfield Avenue. *Id.* at 9:5-22, 10:3-6, 12:1-10, 13:15-20, 19:7-20:16. The front desk officer also told him that drugs were possibly inside the car and that a confidential informant had reported the existence of a gun in the car's glove compartment. *Id.* at 12:1-10, 20:24-21:6, 30:18-21, 35:5-6. At some point prior to the stop, Officer Scillia also learned that the car's driver was the Defendant,

---

[1] The officer at the front desk was a trained police officer. Hr'g Tr. 70:9-11, ECF No. 48.
[2] Officer Scillia never spoke to the task force officer personally or directly. Hr'g Tr. 32:21-24, ECF No. 48.

Stephen Goins.  Def.'s Ex. E, Police Dispatch Warning.[3]  He did not learn the identity of the informant, who was Mr. Goins's mother, or any history of her reliability as an informant until after the stop.  Hr'g Tr. 35:3-6, ECF No. 48.

It is unclear whether Officer Scillia knew that the confidential informant who had provided the information about the gun was riding in the car at the time he left the precinct to pursue it.  Officer Scillia testified that he knew that the confidential informant was female and riding in the car at the time.  Hr'g Tr. 30:18-21, 34:21-35:6, ECF No. 48.  However, Sergeant Amato testified that Officer Scillia told him at the scene of the stop that he did not know the car's passenger was a confidential informant.  *Id.* at 92:14-18.  As a matter of fact, the confidential informant, Mrs. Goins, was riding in the car at the time the stop occurred.  *Id.* at 104:25-105:36.

Officer Scillia recruited two other officers, Officers Roscoe and Delgado, and drove with them in separate cars on Interstate-95 to the location on Fairfield Avenue, where the front desk officer had indicated the car was heading.  *Id.* at 15:10-20, 15:25-16:2.  When exiting the Interstate near the car's destination, Officer Scillia testified that he saw a vehicle directly in front of him make a left turn without signaling.  *Id.* at 16:25-17:4, 21:16-23.  He also memorialized this observation in the Incident Report he filed about the stop later that same day.  Def.'s Ex. A, Incident Report Filed by Officer Scillia dated 6/26/2014, ECF No. 23-1.  Mr. Goins argues that, as a matter of fact, he did use his turn signal.  Because the Officers Delgado and Roscoe were in separate cars behind Officer Scillia, none of them had a clear view of the signal on this car.  Hr'g

---

[3] Before leaving the precinct to pursue the car, Officer Scillia asked dispatch to issue a warning over the "main police channel" about the car and the gun to ensure that if another officer stopped the car, their safety would not be at risk.  Hr'g Tr. 19:7-16, ECF No. 48.  The dispatch indicates what Officer Scillia knew at the time he left the police station.  It includes details about the make and model of the car, the full license plate, the driver's name, and warnings that there was a gun in the car's glove compartment and drugs in the car.  Def.'s Ex. E, Police Dispatch Warning.

Tr. 16:7-13, 54:11-16, 62:23-63:5, ECF No. 48.  As a result, none of them can confirm or deny

that Mr. Goins signaled.  As will be discussed in more detail below, the Court finds that the

Government has shown by a preponderance of the evidence that Officer Scillia observed a traffic

violation.

When Officer Scillia took a closer look at the car that turned without a signal, he realized

that it matched the description of the vehicle he had left the precinct to pursue.  *Id.* at 16:25-17:4,

17:9-11.  Officer Scillia activated his siren. *Id.* at 17:11-19.  Mr. Goins's car moved slowly for

"over a block," and Officer Scillia saw the driver "moving towards the center" of the car and

"doing something."  *Id.* at 18:10-18, 54:21-55:1.  He also included a description of these

movements in his Incident Report and noted that "[t]hese movements are frequently associated

with parties hiding contraband, or possibly readying a weapon[ ]."  Def.'s Ex. A, Incident Report

Filed by Officer Scillia dated 6/26/2014, ECF No. 23-1.  Officer Scillia testified that these

movements made him fear for his safety because, based on his discussion with the front desk

officer, he believed that a gun was in the glove compartment.  Hr'g Tr. 18:21-19:3, 46:2-24, ECF

No. 48.

When the car stopped, Officer Scillia approached the driver's side and asked the driver,

Mr. Goins, for his "paperwork," by which he meant his license, registration and insurance card.

*Id.* at 22:5-8, 23:6-11.  Officer Roscoe approached the passenger side, and while Officer Scillia

was discussing the "paperwork" with Mr. Goins, the passenger whispered to Officer Roscoe that

there was a gun in the glove compartment.  *Id.* at 55:22-56:20.  There is no evidence that Officer

Roscoe conveyed this statement to Officer Scillia, and it does not appear in Officer Scillia's

report.  Def.'s Ex. A, Incident Report Filed by Officer Scillia dated 6/26/2014, ECF No. 23-1.

Because Mr. Goins did not have the "paperwork" in his hand, Officer Scillia asked him and the

passenger to step out of the car.  Hr'g Tr. 23:13-16, 24:13-15, ECF No. 48.  Officer Scillia

testified that he wanted Mr. Goins to step out of the car in order to separate him from the gun

that he believed was in the glove compartment.  *Id.* at 23:19-25.

Once the pair exited the car, Officers Scillia and Delgado moved Mr. Goins to the rear of

the car, and Officer Roscoe and the passenger walked toward the front.  *Id.* at 57:10-15, 57:25-

58:6.[4]  Officer Scillia then walked from the rear of the car to the front and recovered a loaded

gun in a holster from the glove compartment.  *Id.* at 25:14-15, 58:12-14.  Officer Scillia asked

Mr. Goins if the gun had a permit, and he said no.  *Id.* at 58:20-21. Officer Scillia also called

dispatch and confirmed that Mr. Goins was on parole.  Def.'s Ex. A, Incident Report Filed by

Officer Scillia dated 6/26/2014, ECF No. 23-1.  A subsequent search of the car revealed no

narcotics or other contraband in the car.  Hr'g Tr. 25:16-17; 47:12-48:5, ECF No. 48.

A few minutes after the stop and after Officer Scillia recovered the gun, Sergeant Amato

arrived on the scene. At some point after Officer Scillia had left the precinct, the front desk

officer had reached Sergeant Amato and conveyed to him the information from the New Britain

task force officer about the car and the gun.  *Id.* at 69:24-70:8.[5]  After discussing the tip with the

New Britain police officer, Sergeant Amato came up with a "game plan" to stop the car, unaware

that Officer Scillia was already out to apprehend the car.  *Id.* at 70:12-71:2, 72:9-14, 90:21-25.

While he was waiting to stop the car, he learned that it had already been stopped and went to the

location of the stop.  *Id.* at 73:2-6, 91:1-8.

---

[4] The Government contends that, while Mr. Goins was at the rear of the car, he consented to a search of the glove compartment.  Gov't Suppl. Br. 3, ECF No. 50.  Officer Scillia testified that he told Mr. Goins that he assumed the registration and insurance was in the glove compartment and that he was "going to get it."  Hr'g Tr. 24:20-24, ECF No. 48.  He asked Mr. Goins if retrieving the paperwork from the glove compartment was "okay" and received no "complaint" from him.  *Id.*  Mr. Goins disputes that this conversation occurred as a matter of fact.  He argues that no other officer testified that the confession occurred and that it did not appear in Officer Scillia's police report.  Def.'s Suppl. Br. 3, ECF No. 49.  Because the Court finds that this fact is not relevant to determining whether the search of the car was legally permissible, it need not resolve this dispute.
[5] Before receiving this tip, Sergeant Amato had never interacted with Mrs. Goins.  Hr'g Tr. 85:1-4, ECF No. 48.  He testified that she had been honest with him in all of their subsequent interactions.  *Id.* at 87:1-9.

Sergeant Amato had some concerns about how the stop was executed.  He worried that it revealed the identity of the source of the information, namely the passenger, Mrs. Goins.  *Id.* at 92:5-9.  He expressed these concerns to Officer Scillia at the scene of the stop.  *Id.* at 26:21-27:5, 92:10-12, 92:19-21, 94:25-95:6.  He then instructed Officer Scillia to omit any information about the confidential informant and the information from the New Britain Task Force officer in his police report.  *Id.* at 100:19-101:3.  He indicated to Officer Scillia that including information about the confidential informant in his report could jeopardize her safety.  *Id.* at 27:12-15, 101:2-3.  Sergeant Amato also indicated that he would document information about the tip separately.  *Id.* at 27:12-18.  At the time, Sergeant Amato was the superior commanding officer at the scene.  *Id.* at 101:4-8.  Consistent with Sergeant Amato's testimony, Officer Scillia's Incident Report contains no information about the confidential informant tip.  Def.'s Ex. A, Incident Report Filed by Officer Scillia dated 6/26/2014, ECF No. 23-1.  Nor does the report indicate that the reader should refer to Sergeant's Amato's report for background on why the stop occurred.  *Id.*[6]

After his conversation with Officer Scillia, Sergeant Amato read Mr. Goins his rights, while he was handcuffed at the back of a marked Bridgeport police car.  Hr'g Tr. 73:12-14, 74:13-75:3, ECF No. 48.  Mr. Goins agreed to speak to him.  *Id.*  At no point during this interview did Mr. Goins ask to stop talking or to speak with a lawyer.  *Id.* at 75:6-11.

Mr. Goins initially denied knowing that there was a gun in the car.  *Id.* at 75:17-23.  Sergeant Amato then told Mr. Goins that the car's passenger, his mother, and its owner, his fiancé, could be arrested for possessing the gun.  *Id.* at 77:18-78:6.  He also indicated that Mr. Goins's fiancé had denied owning the gun in a telephone conversation she had with Officer

---

[6] The report does instruct the reader to refer to Sergeant Amato's report for details about the confession.  Def.'s Ex. A, Incident Report Filed by Officer Scillia dated 6/26/2014, ECF No. 23-1.

Roscoe a few minutes earlier.  *Id.* at 78:7-9.  Mr. Goins repeated that he knew nothing about the gun.  *Id.* at 78:12-13.

Apparently trying a different tactic, Sergeant Amato then told Mr. Goins that people possess firearms for protection on occasion "because things happen in their lives."  *Id.* at 79:18-24.  Mr. Goins then told Sergeant Amato that the gun belonged to him.  *Id.*  He also told him that he needed the gun for protection because someone had broken into his house in Waterbury over the weekend and he was afraid of him.  Def.'s Ex. B, Supplemental Report Filed by Sergeant Amato dated 6/26/2014, ECF No. 23-1.

After speaking to Sergeant Amato at the location of the stop, Mr. Goins was taken to the Bridgeport Police Department and a hospital.  Hr'g Tr. 80:2-25, ECF No. 48.  Sergeant Amato then spoke to Mr. Goins again around midnight, roughly four to five hours after his arrest, at the police station.  *Id.* at 80:15-18; Def.'s Ex. B, Supplemental Report Filed by Sergeant Amato dated 6/26/2014, ECF No. 23-1.  At the beginning of this conversation, Mr. Goins signed a "waiver form," indicating that Sergeant Amato had read him his rights and that he was voluntarily declining to speak to an attorney.  Hr'g Tr. 83:3-5, 83:24-84:1, ECF No. 48; Gov't Ex. 4, Recording of Sargent Amato's Interview of Stephen Goins.  The Bridgeport Police Department has been unable to locate a copy of this signed waiver form.  Hr'g Tr. 83:6-23, ECF No. 48.

During this conversation at the police station, Mr. Goins reiterated that the gun belonged to him and that he had obtained the gun to protect him and his family from someone who had been threatening them.  Def.'s Ex. B, Supplemental Report Filed by Sergeant Amato dated 6/26/2014, ECF No. 23-1; *see also* Gov't Ex. 4, Recording of Sargent Amato's Interview of Stephen Goins.  At no point during this second conversation did Mr. Goins indicate that he

wanted to stop talking or that he wanted to speak to a lawyer.  Hr'g Tr. 75:6-11, 84:9-14, ECF
No. 48.

### B.  Resolution of Factual Disputes

Mr. Goins disputes a number of facts the Government claims occurred.  Based on the
above summary of the factual events, the only factual dispute relevant to the resolution of Mr.
Goins's motion is the issue of whether Mr. Goins used his turn signal.  Mr. Goins disputes that
he turned without signaling as a matter of fact.  In support of this argument, Mr. Goins points out
various factual inconsistencies in Officer Scillia's testimony and in his police report that, he
argues, undermines the credibility of his testimony about the turn signal.  For example, Mr.
Goins points to the omission of the discussion Officer Scillia had with the front desk officer and
any mention of a confidential informant from the police report.  Def.'s Suppl. Br. 3, ECF No. 49.
Indeed, the police report presents this stop as a routine traffic stop, based exclusively on Mr.
Goins's failure to signal.  Def.'s Ex. A, Incident Report Filed by Officer Scillia dated 6/26/2014,
ECF No. 23-1.

Mr. Goins argues that Officer Scillia had a "motive" to claim falsely that he did not
observe a turn signal, because he wanted to keep Mrs. Goins's name out of the report to follow
Sergeant Amato's instruction.  Def.'s Suppl. Br. at 5, ECF No. 49.  However, the Court is
satisfied by the Government's explanation that details about a confidential informant's assistance
are often excluded from police reports to protect their safety and that Sergeant Amato, a superior
officer, had instructed Officer Scillia to omit that information in this case.  Indeed, every police
officer who testified at the evidentiary hearing indicated that excluding confidential informant
information from a police report was often necessary.  Hr'g Tr. 27:24-28:5, 66:22-7, 89:20-90:2,
100:25-3, ECF No. 48.  Mr. Goins also points to the contradicting testimony about whether

Officer Scillia knew that Mrs. Goins was riding in Mr. Goins's car at the time of the stop.  Def.'s Suppl. Br. 2, ECF No. 49.  The Court does not believe that such an inconsistency is so critical as to undermine the credibility of all of Officer Scillia's testimony.

Mr. Goins also offers the testimony of two witnesses, which he argues is sufficient to rebut Officer Scillia's testimony.  Def.'s Suppl. Br. 4-5, ECF No. 49.  The car's passenger, Mrs. Goins, testified that she saw Mr. Goins signal before turning left off the Interstate exit.  Hr'g Tr. 105:12-16, ECF No. 48.  The record contains no detail of how precisely she knew he signaled— for example, whether she observed Mr. Goins's hand make a movement consistent with signaling or whether she saw a light blink on the dashboard indicating that a signal had been activated.  It is also undisputed that she was riding in the car prior at the time of the stop and, therefore, cannot confirm whether the signal was observable from outside the car.  *Id.* at 104:24-105:6.  Second, the car's owner, Mr. Goins's fiancé, testified that the day after the stop, the car's turn signals were working properly.  *Id.* at 108:16-20, 109:7-9, 110:6-111:1.[7]  She also testified that she had purchased the car two weeks before the stop. *Id.* at 110:24.  It is undisputed that she was not present on the day Officer Scillia stopped Mr. Goins.

The Court finds that Officer Scillia's testimony satisfies the Government's burden of showing that Mr. Goins turned without signaling by a preponderance of the evidence.  Mr. Goins's witnesses do not directly rebut Officer Scillia's testimony, because none of them were outside of the car and able to view the signal at the time Mr. Goins turned.  At most, their testimony raises an inference that the turn signal was working properly and that Mr. Goins intended to use the turn signal.  It does not prove that Officer Scillia lied or that Officer Scillia

---

[7] She testified that she checked to see if the turn signals were working the day after the stop because an officer who called her about the incident said that the signals were not working.  Hr'g Tr. 111:10-14, ECF No. 48.

did not observe a traffic violation.  Accordingly, the Court finds that Officer Scillia observed Mr. Goins turn without signaling when exiting Interstate-95.

## II.   DISCUSSION

Illegally obtained evidence is not admissible at a criminal trial under the exclusionary rule.  *See e.g.*, *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation omitted) (in the context of a Fourth Amendment violation); *United States v. Anderson*, 929 F.2d 96, 98-99, 102 (2d Cir. 1991) (in the context of the voluntariness of a confession under the Fifth Amendment); *see also Terry v. Ohio*, 392 U.S. 1, 12-13 (1968) (noting that the exclusionary rule maintains "judicial integrity" and "has been recognized as a principal mode of discouraging lawless police conduct") (citations omitted); 2A Charles Alan Wright *et al.*, *Federal Practice & Procedure Criminal* §408 (4th ed. 2015).  Under this doctrine, Mr. Goins moves to suppress both the gun that was recovered during the search as well as the statements he made to the interrogating officer both at the time of the arrest and at the police station.  Def.'s Br. 7, ECF No. 24.  He claims that the police who stopped him and searched his car violated his Fourth Amendment rights and that this violation justifies suppressing both the gun and the confessions.  He also argues that the officer who obtained two confessions from him that the gun belonged to him violated his Fifth Amendment rights, because the confessions were involuntary.

### A.  The Gun

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  In other words, it prohibits unreasonable searches and seizures.  *Terry v. Ohio,* 392 U.S. 1, 9 (1968) ("'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'") (citation omitted).  The Fourth Amendment's protections apply to the stop of a

11

vehicle.  *See Scopo*, 19 F.3d at 781 ("'[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth [ ] Amendment[ ].'") (citation omitted).  They also apply to any subsequent search of that vehicle, so long as the defendant can show a legitimate expectation of privacy in the vehicle.  *See United States v. Perea,* 986 F.2d 633, 639-40 (2d Cir. 1993) (discussing the need to show a legitimate expectation of privacy in the location or object searched); *United States v. Wilson*, 699 F.3d 235, 245-46 (2d Cir. 2012) (applying the Fourth Amendment to the search of a vehicle).

### 1.  The Stop

An ordinary traffic stop must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, that the suspect is engaged in criminal activity.  *Scopo,* 19 F.3d at 781 (citation omitted); *see also generally Terry v. Ohio,* 392 U.S. 1 (1968).  Any evidence seized as a result of an illegal stop may be suppressed under the "fruit of the poisonous tree" doctrine.  *Scopo*, 19 F.2d at 781 (citation and internal quotation marks omitted).

"Probable cause arises when the police reasonably believe that 'an offense has been or is being committed.'"  *Id.* (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077 (1988)).  In the context of a traffic stop, to have probable cause, officers must observe "objective circumstances" that indicate a traffic law violation has occurred.  *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1999) (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)); *see also United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (finding that probable cause existed to stop a car where an "objectively reasonable" police officer would have suspected the windows were tinted in violation of a traffic law).

For the reasons discussed above, the Government has shown by a preponderance of the evidence that Officer Scillia observed Mr. Goins turn without signaling.  "A police officer has

probable cause to stop a car when he observes a minor traffic violation." *Levy v. Kick*, No. 3:06cv390(PCD), 2007 WL 2492036, at *6 (D. Conn. Aug. 30, 2007) (citation omitted); *see also Scopo*, 19 F.3d at 782 ("'When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.'") (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990), *cert. denied*, 502 U.S. 962 (1992)). Failing to signal a turn is a violation of Connecticut law. *See* Conn. Gen. Stat. §§14-242(a), (g) (requiring that a driver give an "appropriate signal" when turning at an intersection and defining a violation of this provision as an "infraction"). Mr. Goins's turn without a signal, therefore, provided Officer Scillia with probable cause to stop the car.

The stopping officer's subjective intent is irrelevant to this inquiry. Even if Officer Scillia used the traffic violation as a "pretext" to stop the car to search for the gun, the stop was still legally proper under the Fourth Amendment. *Dhinsa*, 171 F.3d at 724-25 ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance… an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation."). Because the stop was consistent with the Fourth Amendment's requirements, it does not justify suppressing any evidence.

## 2. The Search of the Glove Compartment

In seeking to suppress evidence obtained in a warrantless search, a defendant must first "show that he had a reasonable expectation of privacy in the place or object searched." *Perea*, 986 F.2d at 639 (citations omitted). Once the defendant has done so, the Government must show "that the search was valid because it fell within one of the exceptions to the warrant requirement." *Id.* (citations omitted).

Mr. Goins has shown that he had legitimate expectation of privacy in the car's contents, because he was driving it with the owner's permission.  Hr'g Tr. 108:12-15, ECF No. 48 (Mr. Goins's fiancé testified that she had given him permission to use her car on the day of the stop); *see also United States v. Pena,* 961 F.2d 333, 337 (2d Cir. 1992) (noting that a person who borrows another's car has an enforceable privacy interest in that car if he had a legitimate basis, such as permission from the owner, for his presence in the car) (citing, among others, *United States v. Ponce,* 947 F.2d 646, 649 (2d Cir. 1991))*; see generally Rakas v. Illinois,* 439 U.S. 128, 143 (1978) (The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (citation omitted); *see also e.g.*, *United States v. Graham,* 119 F.Supp. 2d 116, 123 (D. Conn. 2000) (holding that the defendant had a legitimate expectation of privacy in a car she had borrowed with permission of its owner and that this conclusion was "further supported by the nature of the close personal relationship between the defendant and [the car's owner]," who was the defendant's mother). Accordingly, the Court must evaluate whether the Government has shown that the search of the car was constitutional and fell into one of the recognized exceptions to the warrant requirement.

When police officers stop a vehicle legally, the Fourth Amendment allows them to conduct a limited search of areas in the passenger compartment "in which a weapon may be placed or hidden" to ensure their personal safety.  *Michigan v. Long,* 463 U.S. 1032, 1049 (1983).  Such a search is only justified if the officer "possesses a reasonable belief that based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049-50 (citing *Terry,* 392 U.S. at 21); *see also*

*Adams v. Williams*, 407 U.S. 143, 146 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope" "to allow the officer to pursue his investigation without fear of violence.").  In other words, an officer need not have "probable cause" to justify such a protective search.  Instead, he need only satisfy the lower standard set forth in *Terry*.  *See Long*, 463 U.S. at 1049 n.14 ("[W]e require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*."); *United States v.* Miller, 430 F.3d 93, 98 (2d Cir. 2005) (noting that "*Long* extended *Terry*'s reasoning to the context of a roadside stop").

Showing reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015) (quoting *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014)) (internal quotation marks omitted).  In evaluating whether an officer had reasonable suspicion, the Court must consider the totality of the circumstances. *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

The Court finds that, based on the information he obtained from the front desk officer, as well as the circumstances of the stop, Officer Scillia had a "reasonable belief" that Mr. Goins was armed and that he could gain immediate control of a weapon.  First, Officer Scillia observed Mr. Goins making furtive movements prior to the stop, which the Second Circuit has recognized is consistent with obtaining weapons and, therefore, justifies a protective search. *See United States v. Paulino*, 850 F.2d 93, 98 (2d Cir. 1988) (noting that defendant's "furtive movement provided a legal basis for the protective search" where the location of the search related to the movement observed), *cert. denied*, 490 U.S. 1052 (1989).  Such movements alone have been

found to justify a protective search in the absence of any other information, so long as the search occurs near where the furtive movement was directed. *See id.*; *see also e.g.*, *United States v. Torres*, No. Cr. 1159 (JGK), 2011 WL 2209144, at *7 (S.D.N.Y. June 7, 2011) ("[The] search was fully justified under *Long*.  The defendant's vehicle was validly stopped based on the… traffic infractions that the officers observed.  Upon approaching the vehicle, both [officers] saw the defendant make a suspicious movement toward the dashboard.  That movement alone was sufficient to justify a protective search of the dashboard compartment."); *United States v. Bulluck*, No. 09 Cr. 652(PGG), 2015 WL 4998573, at *9-10 (S.D.N.Y. Aug. 20, 2015) (holding that a protective search under the driver's seat was legally justified after a proper traffic stop, where the driver took a plastic bag off his lap and attempted to push it under his seat).  Here, Officer Scillia observed Mr. Goins making movements toward the center or passenger side of the car in the moments prior to the stop.  These movements created a reasonable suspicion that there was something of danger in the glove compartment on the passenger side and justified a protective search of that compartment.[8]

The fact that Mr. Goins was outside of the car when Officer Scillia opened the glove compartment does not invalidate the search.  A protective search of a car's passenger compartment may occur legally while its occupants are outside.  *See e.g.*, *United States v. Gonzalez*, 954 F. Supp. 48, 49 (D. Conn. 1997) ("There is [ ] no dispute that the Supreme Court's decision in *Long* permits a protective search of a car while its occupants are being detained outside."); *Bulluck*, 2015 WL 4998573, at *10.  Such a search is justified, because without it, officers are placed in the difficult situation of not having any legal basis to detain suspects outside of the car but also fearing that allowing them to return to a car will give them access to a

---

[8] Officer Scillia also testified that he searched the glove compartment because he feared for his safety, based on his observation of the furtive movements and his discussion with the front desk officer about the gun.  Thus, his action was both objectively and subjectively justified.

weapon.  *Gonzalez*, 954 F. Supp. at 49; *see also United States v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994) (observing that an officer who receives an anonymous tip about a suspect possessing a gun has an "'unappealing choice'" in that "[h]e must either stop and search the individual or wait until the individual brandishes or uses the gun.") (citation omitted); *Terry*, 392 U.S. at 24 ("[I]t would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.").

Second, when considered together with the furtive movements, the tip and Officer Scillia's corroboration of some aspects of that tip through observation in the field were sufficient to create a reasonable suspicion collectively that there was a gun in the glove compartment.  To generate "reasonable suspicion," a tip must "bear[ ] sufficient 'indicia of reliability'" based on the totality of the circumstances.  *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *Adams*, 407 U.S. at 147); *see also Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (holding that in assessing the reliability of a tip, courts should apply a totality-of-the-circumstances approach).  In assessing a tip for reliability, the Court must consider the basis for the informant's knowledge, his or her veracity (if the informant is known), as well as any corroboration of the tip by subsequent investigation.  *See Elmore*, 482 F.3d at 179-81.  The analysis of a tip's reliability is the same as under both the probable cause and reasonable suspicion standards, except for the degree of certainty required.  *See Alabama v. White*, 496 U.S. 325, 328-29 (1990).  Thus, a tip can generate reasonable suspicion based on lesser showing of reliability.  *See id.* at 329.

The Government argues that, while Officer Scillia did not know the confidential informant personally, he knew that a New Britain task force officer had decided that the tip was

actionable because he called the Bridgeport police.  Opp. Br. 12-14, ECF No. 25; Gov't Suppl.

Br. 11-12, ECF No. 50.  In other words, a Bridgeport police officer relied on information from a

New Britain task officer, who had a basis to know the informant was sufficiently reliable,

thereby creating a reasonable suspicion that her information was accurate.  The Supreme Court

has recognized the validity of such an imputation argument, but it fails here.

In *United States v. Hensley*, the Supreme Court held that police officers from one police

department could act on a flyer indicating that another department had reasonable suspicion of a

suspect's involvement in a crime.  469 U.S. 221, 232 (1985).  However, the Court noted that

such action was only proper under the Fourth Amendment, if the police department that

originated the flyer had a legally sufficient basis for doing so.  *Id.* ("If the flyer has been issued

in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the

Fourth Amendment."); *accord United States v. Colon*, 250 F.3d 130, 135-36 (2d Cir. 2001) ("A

primary focus in the imputed knowledge cases is whether the law enforcement officers initiating

the search or arrest, on whose instructions or information the actual searching or arresting

officers relied, had information that would provide reasonable suspicion or probable cause to

search or arrest the suspect.") (citations omitted).

In this case, there is insufficient evidence that the New Britain police had enough

information about Mrs. Goins's reliability for her tip to have generated reasonable suspicion or

probable cause that there was a gun in the glove compartment.  The only evidence in the record

of Mrs. Goins's history with the New Britain police is Sergeant Amato's testimony that they

were receiving "ongoing" phone calls and text messages from her.  Hr'g Tr. 71:19-24, ECF No.

48.  There is no evidence that the New Britain police officer found her a reliable source prior to

the stop.

The mere fact that the New Britain officer decided to act on the information, which Officer Scillia took as a sign of its reliability, Hr'g Tr. 35:14-19, ECF No. 48, is insufficient to show that the New Britain officer reasonably believed Mrs. Goins's information was sufficiently reliable to generate probable cause or a reasonable suspicion. Indeed, this circular line of logic does not enable the Court to determine, consistent with *Hensley*, whether the New Britain officer who called the Bridgeport police believed that reasonable suspicion or probable cause existed based on the tip. Thus, the search cannot be justified on an imputation theory.

However, the Court finds that, even though he did not know the identity of the informant, Officer Scillia had enough information to form a reasonable suspicion that Mr. Goins was armed and could access a weapon. Because anonymous tips generally fail to indicate the informant's basis of knowledge or history of truthfulness, they are often insufficient to create reasonable suspicion alone. *Bold*, 19 F.3d at 102 (citation omitted). Anonymous tips, however, can create reasonable suspicion, if sufficiently corroborated through independent investigation. *White*, 496 U.S. at 331-32; *accord Elmore*, 482 F.3d at 179. Where an informant is completely anonymous, a high degree of corroboration is required. Elmore, 482 F.3d at 181. However, not every aspect of an anonymous tip needs to be corroborated for it to justify a reasonable suspicion. If some aspects of the tip are corroborated, "[e]ven the uncorroborated aspects of the tip become more credible because once 'an informant is shown to be right about some things, he is probably right about other facts that he has alleged.'" *United States v. Hoskie*, No. 3:99-CR-128, 2000 WL 1052022, at *5 (D. Conn. July 26, 2000) (quoting *White*, 496 U.S. at 331) (analyzing an anonymous tip).

Officer Scillia encountered a car matching the description provided in the tip in terms of its color, license plate, and number of passengers. It also was traveling toward the destination

provided in the tip.  Accordingly, Officer Scillia's investigation revealed the tip's accuracy to a sufficient degree for it to generate a "reasonable suspicion" that there was a gun in the car's glove compartment.  *See White*, 496 U.S. at 332 (holding that an anonymous tip was sufficiently reliable to give officers legal authority for a *Terry* stop where the officers corroborated the location, time of the departure, destination, and car description).  In particular, the location of the car at the time it was stopped corroborated the expected destination of the car.  The Supreme Court has indicated that the corroboration of future movement predictions is particularly important in determining whether an anonymous tip can create reasonable suspicion.  *See c.f. Florida v. J.L.*, 529 U.S. 266, 271 (2000) (finding that the corroboration of the description of a suspect without any confirmation of predictive details was insufficient to justify a *Terry* stop).

Mr. Goins argues that the tip cannot form the basis for the stop or the search because it did not indicate that the gun was illegal, either because it was possessed by a felon or without a permit.  Def.'s Suppl. Br. 7-10, ECF No. 49.  However, because the purpose of a *Terry* search is to protect the safety of the officer, the lawfulness of the defendant's possession of a gun is irrelevant to whether such a search was justified.  *See Long*, 463 U.S. at 1052 n.16 ("Long also argues that there cannot be a legitimate *Terry* search based on the discovery of the hunting knife because Long possessed that weapon legally… [W]e have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law.").

The Court finds that the totality of the circumstances in this case, namely the anonymous tip, as corroborated by Officer Scillia, and Mr. Goins's furtive movements before the stop, created a reasonable suspicion that Mr. Goins was armed and dangerous.  *See United States v. Muhammad*, 463 F.3d 115, 122-24 (2d Cir. 2006) (holding that while an anonymous tip "lacked

any indicia of reliability," the corroboration of the description and location of the suspect and the fact that he fled the police in a high crime area justified a stop and protective patdown search); *United States v. Simmons*, No. 05 CR. 1288(AKH), 2007 WL 162479, at *3-4 (S.D.N.Y. Jan. 18, 2007) (noting that "[w]hen other factors are present that alert the police to the possibility of wrongdoing, [ ] these factors in conjunction with an anonymous tip may create reasonable suspicion" and finding that an anonymous tip about an "assault in progress" that possibly involved a firearm, the corroboration of the suspect description and address of the tip, the fact that a large group was gathered at 4:25 am, and the suspect's refusal to remove his hands from his pockets created reasonable suspicion that criminal activity was afoot) (citation omitted).  This reasonable suspicion justified Officer Scillia's search of the glove compartment.  Because the search complied with the Fourth Amendment, it provides no basis for suppressing any evidence at Mr. Goins's criminal trial.

### B.  The Confessions

Mr. Goins seeks to suppress his confessions because, he argues, they were involuntary, in violation of the Fifth Amendment, and the products of an unlawful search, in violation of the Fourth Amendment.  Def.'s Br. 7, ECF No. 24.  For the reasons discussed above, the Court has found that no Fourth Amendment violation occurred.  Thus, the "fruit of the poisonous tree" doctrine[9] cannot render any of Mr. Goins's confessions inadmissible.  Therefore, the Court will proceed to analyze them under the Fifth Amendment.

---

[9] The "fruit of the poisonous tree" doctrine enables the suppression of evidence obtained from an illegal action, typically a Fourth Amendment violation, if a defendant can show a sufficient nexus between the illegal act and the evidence.  *See Murray v. United States*, 487 U.S. 533, 536-37 (1988) (noting that the exclusionary rule prohibits introduction into evidence of both tangible and testimonial evidence obtained during an unlawful search or as an indirect result of that unlawful search); *see also Brown v. Illinois,* 422 U.S. 590, 604-05 (1975) (excluding statements made to the police after an illegal arrest as fruit of an unconstitutional action under the Fourth Amendment); *see also New York v. Harris,* 495 U.S. at 14, 19 (1990) ("[T]he indirect fruits of an illegal search or arrest should be suppressed where they bear a sufficiently close relationship to the underlying illegality.") (citing *Wong Sun v. United States,* 371 U.S. 471 (1963))

### 1.  Fifth Amendment Analysis - Voluntariness

Involuntary confessions that are the product of mental or physical coercion are not admissible, regardless of the probable falsity or truth of the confession.  *See Blackburn v. Alabama*, 361 U.S. 199, 205-06 (1960); *Rogers v. Richmond*, 365 U.S. 534, 543-45 (1961).  "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citation omitted).  In determining whether a confession was voluntary, the Court should examine "the totality of all surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  *Id.; see also Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988) ("There is only one guide – the totality of the circumstances rule.  No single criterion controls whether an accused's confession is voluntary...") (citations omitted).  The Government must prove that a confession is voluntary by a preponderance of the evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Mr. Goins claims that his confessions were involuntary because the interrogating officer threatened to arrest his mother for possessing the gun if he did not confess to owning it.  Def.'s Br. 15, ECF No. 24.  Although he does not explicitly make arguments addressing the threat to arrest his fiancé, the Court addresses the coercive nature of this threat as well, out of an abundance of caution.[10]

The Supreme Court has indicated that certain kinds of threats made toward family members of the accused by the police may render a subsequent confession involuntary.  *See e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (finding that defendant's oral confession made after the police told her that state financial aid for her child would be stopped and her children taken

---

[10] Sergeant Amato testified that he told Mr. Goins that his fiancé could also be arrested for possessing the gun, as the owner of the car.  Hr'g Tr. 78:2-6, ECF No. 48.

from her was coerced and, therefore, improperly admitted).  The Second Circuit has never

"squarely addressed" whether a threat to a suspect's family member renders a resulting

confession involuntary.  *United States v. Ortiz*, 943 F.Supp. 2d 447, 456 (S.D.N.Y. 2013).

However, several other Circuits and district courts in the Second Circuit have concluded that it is

not coercive to threaten to arrest a suspect's family members if there is probable cause to make

such an arrest.  *See United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) (finding

defendant's confession voluntary and, therefore, admissible where police could lawfully execute

the threat to arrest the defendant's sister); *Thompson v. Haley*, 255 F.3d 1292, 1296-97 (11th Cir.

2001) (holding that a threat to arrest a suspect's significant other was not coercive and did not

make the suspect's confession involuntary because the police had probable cause to arrest the

significant other); *see also e.g.*, *Ortiz*, 943 F.Supp. 2d at 458 (holding that a confession obtained

after a threat to arrest two family members was involuntary and, therefore, inadmissible because

the officers did not have probable cause to arrest either family member).

  Applying this test, the Court finds that Mr. Goins's confession was sufficiently voluntary

because the police could have lawfully arrested Mrs. Goins and Mr. Goins's fiancé for

possessing the gun.  Under Connecticut General Statutes section 29-38(a), the occupant or owner

of a car containing a gun without a proper permit is guilty of a class D felony.  *See State v.*

*Davis*, 111 A.3d 567, 573 (Conn. App. Ct. 2015) (in a prosecution under this section, "the state

must prove: '(1) that the defendant owned, operated or occupied the vehicle; (2) that he had a

weapon in the vehicle; (3) that he knew the weapon was in the vehicle; and (4) that he had no

permit or registration for the weapon.'") (quoting *State v. Delossantos*, 559 A.2d 164, 171

(Conn.), *cert. denied*, 493 U.S. 866 (1989)).  At the time Sergeant Amato questioned Mr. Goins,

the officers had a reasonable basis to believe that the gun did not have a permit, because Mr.

Goins told them so.[11]  *See Silano v. Wheeler*, Civil No. 3:13-CV-00185(JCH), 2015 WL 477179, at *10 & n.14 (D. Conn. Feb. 5, 2015) (finding that probable cause existed to arrest someone for possessing a gun without a permit where the personal orally denied having a permit).

The fact that both Mr. Goins's fiancé and his mother told the police that the gun did not belong to them does not negate probable cause to arrest them.  *See Sewell v. City of New York*, No. 10-CV-5039(JG), 2011 WL 1748733, at *3 n.3 (E.D.N.Y. May 9, 2011) ("It is hardly uncommon for people suspected of crimes to deny their involvement.  When they do, police officers who have probable cause to arrest are not required to adjudicate disputed issues of fact on the spot, nor are they required to walk away.  Once a police officer has probable cause, he need not 'explore every theoretically plausible claim of innocence before making an arrest.'") (quoting *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman [ ] is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forgo arrest pending further investigation if the facts as initially discovered provide probable cause.") (citation omitted).  Thus, the officers had probable cause to arrest Mrs. Goins or the car's owner, Mr. Goins's fiancé, under section 29-38.

Because there is no basis for the Court to conclude that the confessions were involuntary, the motion to suppress Mr. Goins's confessions from evidence on that basis is denied.

---

[11] Moreover, Connecticut courts have found that probable cause may exist for an arrest under this statute, even where officers did not ascertain whether the defendant had a permit to carry the gun.  *See e.g.*, *State v. Williams*, 758 A.2d 400, 403 (Conn. App. Ct. 2000) ("'In determining whether the police officers had probable cause to arrest the defendant for carrying a weapon in a motor vehicle, we also note that *probable cause may exist even without ascertaining whether the defendant had a permit to carry the weapon discovered.*'") (emphasis in original) (quoting *State v. Lizotte*, 525 A.2d 971, 975 (Conn. App. Ct.), *cert. denied*, 528 A.2d 1154 (1987)), *rev'd on other grounds*, *State v. Williams*, 778 A.2d 186 (Conn. 2001).

## III.     CONCLUSION

For all of the aforementioned reasons, Mr. Goins's Motion to Suppress, ECF No. 21, is

**DENIED**.  Both the gun and the confessions are admissible at his upcoming criminal trial.


**SO ORDERED** this fifth day of January 2016, at Bridgeport, Connecticut.


/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge